# In the United States Court of Federal Claims

No. 15-411C
Filed: August 31, 2015[1]

*******************************************

| | | |
|---|---|---|
| THE CLAYGROUP, LLC, | * | Ability-One Program, |
| | * |    41 C.F.R § 51-1.1(a); |
| Plaintiff, | * | Bid Protest, |
| | * |    28 U.S.C. §1491; |
| | * | Competition In Contracting Act Of 1984, |
| | * |    31 U.S.C §§ 3551−3556; |
| v. | * | Judgment On The Administrative Record, |
| | * |    RCFC 52.1; |
| THE UNITED STATES, | * | Small Business Concerns, |
| | * |    38 U.S.C. § 8127; |
| Defendant. | * | Standing. |

*******************************************

**Victor G. Klingelhofer,** Cohen Mohr, LLP, Washington, D.C., Counsel for Plaintiff.

**David M. Kerr**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

### MEMORANDUM OPINION AND FINAL ORDER

**I.    RELEVANT FACTUAL BACKGROUND.[2]**

The ClayGroup, LLC ("ClayGroup") is a Service-Disabled Veteran-Operated Small Business ("SDVOSB") that supplies janitorial and sanitation supplies to the Government. AR 1558.

---

[1] On August 20, 2015, the court issued a sealed copy of this Memorandum Opinion And Final Order and requested that the parties propose redactions to delete from the public version any confidential and/or privileged information. The court has incorporated the parties' proposed redactions herein.

[2] The facts described herein were derived from: the May 15, 2015 Administrative Record ("AR 1−2905"); the Appendix to Plaintiff's April 23, 2014 Complaint ("Compl. App'x Tabs 1− 17, at 1−242"); and the Appendix to the Government's July 10, 2015 Response And Cross-Motion For Judgment On The Administrative Record ("Gov't Mot. App'x 1−117").

In November 2005, the United States General Services Administration ("GSA"), in partnership with the United States Department of Treasury, launched a Federal Strategic Sourcing Initiative ("FSSI"), an interagency procurement vehicle that allows federal agencies to "approach vendors in a single, coordinated enterprise" and "enable[s] the Government to leverage its vast buying power[.]" ABOUT FSSI, https://strategicsourcing.gov/about-fssi-0 (last visited August 20, 2015).

On December 5, 2012, the Office of Management and Budget ("OMB") directed the GSA to "identify at least five products and/or services for which a new [G]overnment-wide acquisition vehicle[] . . . should be developed and made mandatory, to the maximum extent practicable, for the [Strategic Sourcing Leadership Council ("SSLC")][3] agencies." AR 2050. OMB instructed the GSA agencies to promote sound strategic sourcing practices by "issuing and enforcing mandatory use policies for [G]overnment[-]wide and agency[-]wide strategic sourcing solutions to the extent appropriate." AR 2050.

On May 15, 2013, the GSA held pre-solicitation meetings for various Government-wide Blanket Purchase Agreements ("BPAs") for janitorial and sanitation supplies, where the Contracting Officer ("CO") informed ClayGroup and other companies that "[t]hese BPAs are not mandatory at this time." AR 399; *see also* 435 ("We hope that agencies will be purchasing from the BPAs but it is not mandatory.").

On August 22, 2013, the United States Department of Veterans Affairs ("VA") announced that it would:

> conditionally commit VA to use the [FSSI] . . . on a limited basis . . . exclud[ing] AbilityOne[4] purchases, purchases that are obtained under existing VA prime vendor arrangements, and purchases for motorized cleaning equipment and accessories as the anticipated FSSI solution does not anticipate awards to Veteran-owned small businesses (VOSBs) and/or service-disabled Veteran-owned small businesses (SDVOSBs) in this specific category.

AR 1420.

The VA's commitment included three conditions:

---

[3] The SSLC "consist[s] of representatives from the Departments of Defense (DOD), Energy, Health and Human Services, Homeland Security, Veterans Affairs, the General Services Administration, the National Aeronautics and Space Administration, and other agencies as designated by the Administrator" and "lead[s] the [G]overment's efforts to increase the use of [G]overnment-wide management and sourcing of goods and services." AR 2049.

[4] The AbilityOne Program was created "to increase employment and training opportunities for persons who are blind or have other severe disabilities through the purchase of commodities and services from qualified nonprofit agencies employing persons who are blind or have other severe disabilities." 41 C.F.R. § 51-1.1(a).

>   (1) That lower prices actually result in lower cost to VA[.]
>
>   (2) That the eventual vendor mix permits VA to maintain or increase our current spend with small businesses, especially our spend with VOSBs and/or SDVOSBs at costs equal to or less than current costs.
>
>   (3) That the eventual products offered are appropriate for use in healthcare settings as determined by VA healthcare product review committees.

AR 1420.

On October 8, 2013, the GSA issued Request For Quotation No. 832055 ("RFQ") for four Government-wide BPAs to purchase various janitorial and sanitation supplies ("Jan-San BPAs"). AR 1141−82.  The RFQ estimated that federal spending would "be more than $599 million annually," but warned that since "agencies will not be able to formally obligate dollars prior to award, agencies have been asked to provide written statements of commitment from a senior agency official." AR 1142.

On November 5, 2013, in response to vendor questions, the Government published Amendment 0003, providing that "[c]urrent GSA BPA[]s will be allowed to run until their expiration date" and that "any remaining options on the [current] BPA will not be exercised." AR 1463, 1466.

On December 4, 2013, ClayGroup submitted a bid to GSA for three of the four[5] available Jan-San BPAs, with a weighted total extended market basket[6] value of $[REDACTED].  AR 1557−1612; *see also* AR 1574 (Category 1 proposal of $[REDACTED]); AR 1576 (Category 2 proposal of $[REDACTED]); AR 1578 (Category 3 proposal of $[REDACTED]).  On December 9, 2013, the RFQ closed having received sixty-five bids.  AR 1845.

On February 12, 2014, the GSA requested more information about ClayGroup's ability to provide market basket items in each category.  AR 1630–32.  On February 26, 2014, ClayGroup submitted a revised quote of $[REDACTED], requesting only to be considered for the third category of Jan-San BPA: paper products and release dispensers.  AR 1633; *see also* 1639, 1644.

On June 9, 2014, the GSA notified ClayGroup that the "low market basket price for . . . Category 3, Paper Products and Related Dispensers, is $2,296,963.76[.]" AR 1836.  On June 11,

---

[5] The Awards were divided into four categories of goods: Category 1 comprised "Cleaning Compounds & Related Dispensers"; Category 2 comprised "Non-Motorized Cleaning Equipment & Trash Receptacles"; Category 3 comprised "Paper Products & Related Dispensers"; and Category 4 comprised "Motorized Floor Cleaning Equipment & Accessories." AR 1150–51.

[6] "Market basket" is defined as "a variety of consumer goods and services used to calculate a consumer price index."  MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-webster.com/dictionary/market%20basket (last visited Aug. 20, 2015).

2014, ClayGroup submitted a new quote with a weighted total extended market basket value of $[REDACTED].  AR 1756.

On July 17, 2014, the GSA notified ClayGroup that "the proposed quote does not offer the best overall value and most advantageous terms to the [G]overnment[.]"  AR 1764.

On or around July 29, 2014, the GSA awarded contracts for seventeen commodities under the Jan-San BPA, but did not award a Jan-San BPA to ClayGroup.  AR 1842–71.  Two of the Jan-San BPA contracts were awarded to qualified VOSBs.  AR 1869.

On August 26, 2014, ClayGroup entered into BPA No. VA261-BP-C068 with the VA to supply products to medical facilities in the VA's Western States Network Consortium through September 30, 2018.  AR 2133.

On March 19, 2015, the VA's Deputy Assistant Secretary for Acquisition and Logistics issued a Memorandum, providing that the Jan-San "BPAs are mandatory use contradicting vehicles for the seventeen commodities that were standardized by the Veterans Health Administration."  AR 2373.  This Memorandum also specified that this BPA included toilet paper, paper towels, and toilet seat covers that were part of the Category 3 Jan-San BPA for which ClayGroup also submitted a quotation.  AR 2375.

Subsequently, on an unspecified date in 2015, one of ClayGroup's VA customers, VA Eastern Kansas Health Care System, informed ClayGroup that it was no longer permitted to purchase products outside the FSSI Jan-San BPAs.  Compl. App'x Tab 1, at 2 (Clay Decl.) ("[T]he VA Eastern Kansas Health Care System has informed ClayGroup that it cannot place any future orders for paper goods with ClayGroup because such products must now be exclusively ordered from the Jan-San BPA.").

## II.    RELEVANT PROCEDURAL HISTORY.

On April 23, 2015, ClayGroup ("Plaintiff") filed a Complaint ("Compl."), a Motion For a Temporary Restraining Order, and a Motion For Preliminary Injunction in the United States Court of Federal Claims.

On April 23, 2015 and April 27, 2015, the court held telephonic status conferences.

On April 27, 2015, the VA suspended its mandatory use policy, pending the resolution of Plaintiff's claims.  *See* DEP'T OF VETERANS AFFAIRS, MANDATORY USE PROVISIONS TEMPORARILY SUSPENDED FOR JANITORIAL AND SANITATION SUPPLIES (VAIQ 7532850) (2015), *available at* https://interact.gsa.gov/sites/default/files/VAIQ%207532850-Jan-San-revised%20memo%20%282%29.pdf (last visited Aug. 20, 2015).

On April 30, 2015 the parties filed a Joint Proposed Scheduling Order.

On May 8, 2015, the Government filed a Motion For Protective Order that the court entered that same day.  Also on May 8, 2015, the court entered a Scheduling Order.

On May 14, 2015, Plaintiff filed an Amended Complaint ("Am. Compl.").

On May 15, 2015, the Government filed the Administrative Record ("AR 1−2905").

On June 12, 2015, Plaintiff filed a Motion For Judgment On The Administrative Record ("Pl. Mot."), pursuant to Rule 52.1[7] of the Rules of the United States Court of Federal Claims ("RCFC"). On July 10, 2015, the Government filed a Response And Cross-Motion For Judgment On The Administrative Record ("Gov't Mot."). On July 24, 2015, Plaintiff filed a Reply ("Pl. Reply"). On August 7, 2015, the Government filed a Reply ("Gov't Reply").

### III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims is required to make a threshold determination regarding jurisdiction. *See Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005) ("[A]t the outset [the court] shall determine . . . whether the Constitutional provision, statute, or regulation is one that is money-mandating. If the court's conclusion is that the Constitutional provision, statute, or regulation meets the money-mandating test, the court shall declare it has jurisdiction over the cause, and shall then proceed with the case in the normal course.").

Pursuant to 28 U.S.C. § 1491(b)(1), the United States Court of Federal Claims has jurisdiction:

> to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

*Id.*

When interpreting the court's jurisdiction under Section 1491(b)(1), "the operative phrase 'in connection with' is very sweeping in scope." *Distrib. Sols., Inc. v. United States,* 539 F.3d 1340, 1345 (Fed. Cir. 2008) (citations omitted).

The May 14, 2015 Amended Complaint alleges that: (1) "The VA's actions have resulted in the implementation of an exclusive and mandatory standardization scheme that violates [the Competition In Contacting Act of 1984 ('CICA'), 31 U.S.C §§ 3551−3556]'s requirements for full and open competition"; (2) "[T]he change [to an exclusive and mandatory scheme] is significantly beyond the scope of what was anticipated from the VA's initial limited and conditional commitment . . . [and] is beyond the scope of the Jan-San BPAs as they were awarded"; (3) "[T]he VA's decision to deviate from its own established conditions for using the Jan-San BPAs was

---

[7] In 2006, RCFC 56.1 "Review of a Decision on the Basis of the Administrative Record" was repealed and replaced with RCFC 52.1 to conform to the United States Court of Appeals for the Federal Circuit's decision in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1354 (Fed. Cir. 2005) (holding that the court should "make factual findings from the record evidence as if it were conducting a trial on the record"). *See* RCFC 52.1, 2006 Rules Committee Notes.

5

arbitrary and capricious"; (4) "The Government violated its duty of good faith and fair dealing by soliciting the Jan-San BPAs as an optional contracting vehicle, and then subsequently deciding after award to make it an exclusive and mandatory contract for the entire VA"; (5) "The VA's March [19,] 2015 Memorandum conflicts with the plain language and stated purpose of 38 U.S.C. § 8127,[8] and is therefore improper, violates applicable law[,] and may not stand." Am. Compl. ¶¶ 26, 34, 41, 51, 58.

Since the May 14, 2015 Amended Complaint alleges sufficient facts of a money-mandating claim to satisfy 28 U.S.C. § 1491(b)(1), it places in issue potential violations of law or federal regulation "in connection with" the procurement and award of the Jan-San BPAs. As such, the United States Court of Federal Claims has jurisdiction to adjudicate the claims alleged in the May 14, 2015 Amended Complaint.

### B. Standing.

"The party invoking federal jurisdiction bears the burden of establishing the[] elements [of standing]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (alterations added); *see also Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) (same).

As a threshold matter, a plaintiff contesting the award of a federal contract must establish that it is an "interested party" to have standing under 28 U.S.C. § 1491(b)(1). *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1348 (Fed. Cir. 2013) ("In a bid protest, only an 'interested party' has standing to challenge a contract award."); *see also Myers*, 275 F.3d at 1369 (Fed. Cir. 2002) ("[S]tanding is a threshold jurisdictional issue."). The United States Court of Appeals for the Federal Circuit has construed the term "interested party" under 28 U.S.C. § 1491(b)(1) as synonymous with "interested party" under CICA, 31 U.S.C. § 3551(2)(A). *See Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (citing decisions adopting the CICA definition

---

[8] Section 8127(a), in relevant part, provides:

(a) Contracting goals.—(1) In order to increase contracting opportunities for small business concerns owned and controlled by veterans and small business concerns owned and controlled by veterans with service-connected disabilities, the Secretary shall—

> (A) establish a goal for each fiscal year for participation in Department contracts (including subcontracts) by small business concerns owned and controlled by veterans who are not veterans with service-connected disabilities in accordance with paragraph (2); and

> (B) establish a goal for each fiscal year for participation in Department contracts (including subcontracts) by small business concerns owned and controlled by veterans with service-connected disabilities in accordance with paragraph (3).

38 U.S.C. § 8127(a).

of "interested party" for 28 U.S.C. § 1491(b)(1) purposes).  A two-part test is applied to determine whether a plaintiff is an "interested party": the plaintiff must show "1) that it is an actual or prospective bidder and 2) that it has a direct economic interest [in the procurement or proposed procurement]."  *Orion Tech.*, 704 F.3d at 1348 (alterations added); *see also Distrib. Sols.*, 539 F.3d at 1344 (same).

In addition, to establish "interested party" status, a plaintiff must show alleged errors in the procurement that were prejudicial.  *See Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378–79 (Fed. Cir. 2009) ("It is basic that because the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits.") (citations omitted); *see also Myers*, 275 F.3d at 1370 ("[P]rejudice (or injury) is a necessary element of standing.").  Thus, a plaintiff must show "how the [G]overnment's error caused [it] to suffer disparate treatment or particularized harm." *Labatt*, 577 F.3d at 1380.  But, "non-prejudicial errors in a bid process do not automatically invalidate a procurement." *Id.* (citing *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996) ("[T]o establish prejudice, a [plaintiff] must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the [plaintiff] would have been awarded the contract.")).

Importantly, a proper standing inquiry must not conflate the requirement of "direct economic interest" with prejudicial error.  *See id.* (Examining economic interest but excluding prejudicial error from the standing inquiry "would create a rule that, to an unsuccessful but economically interested offeror in a bid protest, any error is harmful.").  "To prove a direct economic interest, a [plaintiff] must show that it had a 'substantial chance' of winning the contract." *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012).  In contrast, to prove prejudice, a plaintiff must "show that *but for the error*, it would have had a substantial chance of securing the contract." *Labatt*, 577 F.3d at 1378 (emphasis added). Therefore, the "direct economic interest" element focuses on the plaintiff's general *likelihood* of winning the contract absent the Government's error, whereas the prejudice inquiry focuses on the effect of the Government's *error* on the plaintiff's chances of winning the contract.

In this case, Plaintiff submitted a timely proposal in response to the RFQ.  AR 1557 (evidencing that Plaintiff's original proposal was submitted on December 4, 2013, *i.e.*, prior to the December 5, 2013 RFQ deadline); *see also* AR 1845 (explaining the extension of the RFQ deadline to December 9, 2013); AR 1557–1612 (Plaintiff's December 4, 2013 proposal).  As an "actual bidder," Plaintiff satisfies the first element of the "interested party" test.  *See Distrib. Sols.*, 539 F.3d at 1345 (holding that the plaintiffs were "actual or prospective bidders," because the plaintiffs "submitted qualifying proposals in response [to a Request for Information (RFI)]" and "were prepared to submit bids pursuant to the anticipated Request for Quotation (RFQ) or Request for Proposal (RFP) that typically ensues after an RFI is issued")).

But, Plaintiff has not satisfied the second element, *i.e.*, that the plaintiff had "a direct economic interest in the procurement or proposed procurement."  "To prove a direct economic interest, a [plaintiff] must show that it had a 'substantial chance' of winning the contract." *Digitalis*, 664 F.3d at 1384.  Although Plaintiff previously sold approximately $5 million in paper products to the VA, accounting for 32% of VA's paper product purchases (AR 2335, 2338), Plaintiff's February 26, 2014 bid and June 11, 2014 revised bid were substantially higher than other offerors.  *Compare* AR 1644 (Plaintiff's February 26, 2014 bid of $[REDACTED]) *and* AR

1756 (Plaintiff's June 11, 2014 revised bid of $[REDACTED]), *with* AR 1722–23 (Category 3 low market basket price of $2,296,963.76) *and* AR 1869 (listing Category 3 awardees' prices as ranging from $2,148,978.40 to $2,550,779.50). Specifically, Plaintiff's bid was [REDACTED]% higher than the VOSB awardee's bid and [REDACTED]% higher than the lowest overall awardee's bid. AR 1869. Therefore, Plaintiff has not shown a "direct economic interest in the procurement or proposed procurement," because Plaintiff has not "show[n] that it had a 'substantial chance' of winning the contract." *Digitalis*, 664 F.3d at 1384.

Finally, "[t]o establish prejudice a [plaintiff] *must* show that there was a substantial chance it would have received the contract *but for the* [G]*overnment's error* in the bid process." *Labatt*, 577 F.3d at 1380 (emphases added); *see also Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed. Cir. 2004) ("To establish prejudice, the [plaintiff] must show that there was a substantial chance it would have received the contract award but for the error.") (citation omitted); *Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003) (The plaintiff "must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."); *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999) ("[T]he [plaintiff] must show that there was a substantial chance it would have received the contract award but for that error."); *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) ("To establish competitive prejudice, a [plaintiff] must demonstrate that but for the alleged error, there was a 'substantial chance that [it] would receive an award[.]") (citation omitted).

Here, Plaintiff does not argue that the Government committed any error in the *award* of Jan-San BPAs to the awardees, arguing instead that the VA erred in its post-award decision to make the Jan-San BPAs exclusive and mandatory. *See generally* Pl. Mot. 1–33 (referring repeatedly to the VA's "post-award" or "after award" decision to make the Jan-San BPAs exclusive and mandatory); *see also* Pl. Reply at 1 ("[Plaintiff] is not challenging the establishment or use of the Jan-San BPAs but instead is challenging the VA's decision to make the Jan-San BPAs mandatory and exclusive for the acquisition of the seventeen items included in the VA's March 19, 2015 [M]emorandum."). This alleged error occurred almost one year after the Jan-San BPAs were awarded and is a distinct issue from the GSA's determination that "[Plaintiff's] proposed quote does not offer the best overall value and most advantageous terms to the Government[.]" AR 1764 (July 17, 2014 GSA email); *see also* AR 2373 (March 19, 2015 VA Memorandum stating that the Jan-San "BPAs are mandatory use contradicting vehicles for the seventeen commodities that were standardized by the Veterans Health Administration").

Of course, when interpreting the court's jurisdiction under Section 1491(b)(1), "the operative phrase 'in connection with' is very sweeping in scope." *Distrib. Sols.*, 539 F.3d at 1345 (citations omitted). And, "[c]ontract modifications may not materially depart from the scope of the original procurement." *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 791 (citing 10 U.S.C. § 2304(a)(1)(A) (emphasizing the importance of "full and open competition")). But, the scope of the court's interpretation under Section 1491(b)(1) cannot supplant traditional requirements of standing. Specifically, "*the term* 'interested party' in section 1491(b)(1) is construed in accordance with the [CICA], 31 U.S.C. §§ 3551–[35]56" (*Rex Serv.*, 448 F.3d at 1307) (citation omitted), interpreting this specific term in accordance with CICA does not mean that: any CICA violation authorizes the court to adjudicate a bid protest, pursuant to 28 U.S.C. § 1491(b)(1); or the plaintiff alleging the CICA violation has standing to bring a claim before the court.

Moreover, the May 14, 2015 Amended Complaint has not alleged that the VA likely would have purchased paper products from Plaintiff, if the Jan-San BPAs were not exclusive and mandatory. In fact, the GSA potentially could add additional BPAs to the Jan-San BPA. AR 1145 ("During the life of these BPAs[,] the Government may award additional BPAs for similar requirements. Additional BPAs will not necessarily have the same end date as those initially awarded."). In other words, the May 14, 2015 Amended Complaint has not alleged that Plaintiff "it would have received the contract but for the [G]overnment's error in the bid process," and thus, has failed to establish prejudice. *Labatt*, 577 F.3d at 1380.

This case is analogous to the United States Court of Appeals for the Federal Circuit's decisions in *Crewzers Fire Crew Transport, Inc. v. United States*, 464 F. App'x 866 (Fed. Cir. 2012) ("*Crewzers I*") and *Crewzers Fire Crew Transport, Inc. v. United States*, 741 F.3d 1380 (Fed. Cir. 2014) ("*Crewzers II*"). In these cases, the plaintiffs brought separate bid protest (*Crewzers I*) and breach of contract (*Crewzers II*) actions stemming from the United States Forest Service's cancellation of the plaintiffs' BPA to provide crew carrier buses. *See Crewzers I*, 464 F. App'x at 867; *Crewzers II*, 741 F.3d at 1381–82. In *Crewzers I*, a pre-award bid protest, the United States Court of Appeals for the Federal Circuit held that the plaintiffs did not have standing, because the Government had cancelled the plaintiffs' BPA, so there was no present controversy or redressability. *See* 464 F. App'x at 868 (holding that the plaintiffs would be "neither restored nor benefitted by [their] requested relief" and that "[w]ithout a BPA, there is no present controversy"). In *Crewzers II*, a breach of contract action, the United States Court of Appeals for the Federal Circuit "h[e]ld that [the plaintiffs] ha[d] failed to present a nonfrivolous allegation that the BPAs at issue here are binding contracts. These BPAs reflect illusory promises that do not impose obligations on either party." 741 F.3d at 1382–83; *see also Ridge Runner Forestry v. Veneman*, 287 F.3d 1058, 1062 (Fed. Cir. 2002) (holding that similar BPAs lacked the mutuality of obligation required to form a binding contract); *Zhenxing v. United States*, 204 F. App'x 885, 886–87 (Fed. Cir. 2006) ("The BPA at issue . . . is merely a framework for future contracts and only creates a contractual obligation with regard to accepted orders. . . . Once an order is placed under the agreement, a contract is created with respect to that order, but the BPA in this case is not a contract because it lacks mutuality of consideration."); *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202 (Fed. Cir. 1992) ("[T]he Postal Service is not obligated to place any orders, and . . . the contractor is not bound unless it accepts an order. The effect of this . . . is that the [basic pricing agreement] itself does not create any enforceable obligations between either party."); 24 NASH & CIBINIC REPORT ¶ 26 ("Of course, using [BPAs] means that the contractor is not contractually bound but that is of little consequence to an agency when there are multiple contractors capable of performing the work.").

In this case, like *Crewzers I*, Plaintiff does not have standing.[9] Therefore, like *Crewzers II*, Plaintiff potentially could bring a breach of contract action, because the March 19, 2015 VA

---

[9] In fact, in this post-award bid protest, Plaintiff faces a higher burden to show standing. *See Sys. Application & Techs.*, 691 F.3d at 1382 (citing *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361–62 (Fed. Cir. 2009); *Rex Serv.*, 448 F.3d at 1307) ("A protest will, by its nature, dictate the necessary factors for a 'direct economic interest.' In pre-award protests, the plaintiff must show 'a non-trivial competitive injury which can be addressed by judicial relief.' In post-award protests, the plaintiff must show it had a 'substantial chance' of receiving the contract."); *see also COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1383 n.7 (Fed. Cir. 2012) (stating

Memorandum stated that the Jan-San "BPAs are mandatory use contradicting vehicles," effectively cancelling any pre-existing agreement that Plaintiff may have had with the VA, such as Agreement No. VA261-BP-C068. AR 2373. But, Plaintiff's May 14, 2015 Amended Complaint does not allege a breach of contract claim, so the court need not determine whether Plaintiff had a binding contractual agreement with the VA that was cancelled by the March 19, 2015 VA Memorandum.

For these reasons, the court has determined that Plaintiff does not have standing, so the court need not consider the merits. *See Info. Tech.*, 316 F.3d at 1319 ("[B]ecause the question of prejudice goes directly to the question of standing, the prejudice issue must be reached before addressing the merits."); *see also Myers*, 275 F.3d at 1369 ("[S]tanding is a threshold jurisdictional issue.").

## IV. CONCLUSION.

For these reasons, Plaintiff's June 12, 2015 Motion For Judgment On The Administrative Record is **denied**. The Government's July 10, 2015 Cross-Motion is **granted**. The Clerk of Court is ordered to dismiss Plaintiff's May 14, 2015 Amended Complaint.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

that the "non-trivial competitive injury" standard applies only to pre-award protests and not to post-award protests); *Orion Tech.*, 704 F.3d at 1348 (applying the "substantial chance" standard, instead of the "non-trivial competitive injury" standard, to the post-award protest); *Labatt*, 577 F.3d at 1378 (stating that a party demonstrates prejudice when "it can show that but for the error, it would have had a substantial chance of securing the contract[]").